**CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
LYLE NANCE,                         :        CIVIL ACTION NO: 04-3298 (FSH)
                                    :
            Petitioner,             :
                                    :
      v.                            :        **OPINION & ORDER**
                                    :
TERRANCE MOORE, et al.,             :        September 15, 2008
                                    :
            Respondents.            :
_____:


       Petitioner Lyle Nance, a prisoner currently confined at East Jersey State Prison, submitted

a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  The respondents are

Terrance Moore, the former administrator of East Jersey State Prison, and the Attorney General

for the State of New Jersey.  After having carefully reviewed the submissions of the parties, the

Court will deny the petition.

**Factual and Procedural History**

       Petitioner was tried in the Superior Court of Essex County for the purposeful or knowing

murder of Michael Snow, felony murder, second-degree burglary of the apartment of his former

girlfriend Donnelle Williams, two counts of endangering the welfare of children and possession

of a weapon for an unlawful purpose.  On March 7, 1994, a jury acquitted the defendant of

purposeful or knowing murder, but found him guilty of the lesser-included offense of aggravated

manslaughter and guilty of the remaining charges.

Petitioner was sentenced to a thirty-year term of imprisonment without parole for the felony murder count, two four-year terms with two years of parole ineligibility on the endangerment charges and a concurrent term of twenty-one years with seven years of parole ineligibility for the aggravated manslaughter count. The weapon and burglary charges were merged with the other convictions.

On April 1, 1996, the Appellate Division reversed Petitioner's conviction and remanded for a new trial. On March 20, 1997, the Supreme Court of New Jersey reversed the appellate decision and remanded back to the Appellate Division for consideration of prosecutorial misconduct and sentencing issues. *State v. Nance*, 148 N.J. 376, 689 A.2d 1351 (N.J. 1997). On April 15, 1998, the Appellate Division affirmed Petitioner's conviction and modified the sentence to run all custodial terms concurrently.

After the Appellate Division's affirmance of his conviction, Petitioner filed several motions, both *pro se* and through numerous attorneys, for Post-Conviction Relief. All of these motions, along with several Motions for Reconsideration and a Petition for Certification to the Supreme Court of New Jersey, were denied. On July 12, 2004, Petitioner filed his petition for *habeas* relief with this Court, citing violations of the Sixth and Fourteenth Amendments. Subsequently, this Court issued an Order to Show Cause, directing Petitioner to show why his application should not be dismissed as time-barred or unexhausted.[1]

---

[1] This Court issued the Order to Show Cause because it was unclear from the papers whether the petition was barred by the statute of limitations. After receiving the parties' response to the Order to Show Cause and considering them in a light most favorable to Petitioner, the Court is satisfied that equitable tolling applies and is considering the petition on its merits. While Petitioner failed to address the exhaustion issue as requested by this Court in the Order to Show Cause, because the Court finds the petition fails on the merits, there is no need to address the exhaustion issue.

**Standard of Review**

Petitioner rests his application for a writ of *habeas corpus* on two substantive theories. He first argues that the gross misconduct of the prosecutor resulted in a violation of his right to due process under the Fourteenth Amendment.  He next argues that his rights under the Sixth Amendment were violated due to ineffective assistance of trial counsel.

The standard for federal *habeas* relief is set forth in 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Further, "a district court shall entertain an application for a writ of habeas corpus... pursuant to the judgment of a State court only on the ground that [petitioner] is in custody in violation of the Constitution or the laws or treaties of the United States."  28 U.S.C. § 2254(a).

The United States Supreme Court elaborated upon this statutory standard in *Williams v. Taylor*, 529 U.S. 362 (2000).  There, the Supreme Court explained that a State court's decision can be "contrary to" Supreme Court precedent if the State court arrives at a conclusion opposite to that of the Supreme Court on a "question of law" or if "the state court confronts facts that are

materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." *Williams*, 529 U.S. at 412–13.  A federal *habeas* court making a determination on an allegedly "unreasonable application" of federal law should ask "whether the state court's application of the clearly established federal law was objectively unreasonable." *Id.* at 409.  In assessing the objective reasonableness of the state court application, "a federal *habeas* court may grant the writ if the State court identifies the correct governing legal principal from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  Because "Congress specifically used the word 'unreasonable' and not a term like 'erroneous' or 'incorrect,'" a federal *habeas* court must conclude that the application of the law was unreasonable, not merely incorrect, for the writ to issue. *Id.* at 411.

While examining actions taken by a state court, federal *habeas* courts should grant proper deference to those state courts.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).  "In a proceeding instituted by an application for a writ of *habeas corpus* by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  This presumption of correctness can only be overcome "by clear and convincing evidence." *Id.*

1.    *Prosecutorial Misconduct*

When considering a claim of prosecutorial misconduct, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness

4

essential to the very concept of justice.'" *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)).  Instead, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643); *see Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3d Cir. 1992)  (quoting *Greer v. Miller*, 483 U.S. 756, 765 (1987)) (holding that "review of a prosecutor's conduct in a state trial on application for a writ of *habeas corpus* is limited to determining whether the prosecution's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.").

The Court must view the prosecutor's remarks in the context of the entirety of the trial. "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.... [T]he remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error." *United States v. Young*, 470 U.S. 1, 11-12 (1985) (citing *Lawn v. United States*, 355 U.S. 339 (1958)).  The Court's decision should be predicated upon "the probable effect the prosecutor's [remarks] would have on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. at 12.

2.    *Ineffective Assistance of Counsel*

Petitioner also claims that he received ineffective assistance of counsel at trial.  To prevail on such a claim, Petitioner must meet the two-pronged test laid out in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, Petitioner must demonstrate that his attorney failed to provide "reasonably effective assistance" and that "counsel's representation fell below an

objective standard of reasonableness." *Id.* at 687-88. Second, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. In demonstrating prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In weighing the effectiveness of counsel, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

**Discussion**

Petitioner makes seven specific claims alleging violations of due process under the Fourteenth Amendment and five specific claims regarding violations of right to effective counsel under the Sixth Amendment. The Court addresses these claims individually and then turns to the assertion that the aggregation of these claims culminated in a larger prejudicial impact.

   *1.      Alleged violations of due process under the 14th Amendment*

Petitioner's claims of due process violations all stem from his allegations of misconduct on the part of the prosecutor at trial. Petitioner raised these issues before the Appellate Division and in subsequent motions for Post-Conviction Relief. Hearing the question on direct appeal, the Appellate Division found that "[c]ertain prosecutor comments were regrettable and inappropriate." *State v. Lyle Nance*, No. A-5668-93 (N.J. Sup. Ct. App. Div. Apr. 1, 1996). However, the Court did not reach any holding on the issue because it already decided to reverse Petitioner's conviction on other grounds. After the New Jersey Supreme Court reversed the Appellate Division's reversal, the Appellate Division addressed the question again on remand,

6

concluding that "either singly or in combination, none of the prosecutor's complained of misconduct was, under the particular circumstances, so egregious as to have denied defendant a fair trial." *State v. Lyle Nance,* No. A-5668-98 (N.J. Sup. Ct. App. Div. Apr. 15, 1998). Petitioner raised the question of prosecutorial misconduct again in motions for Post-Conviction Relief.

       *a.*     *Prosecution's Withholding of Donnelle Williams' Criminal History.*

Petitioner indicates that defense counsel requested information from the prosecution regarding the criminal history of Donnelle Williams, who was present at the time of the shooting and was a key witness against Petitioner. The prosecution indicated that none of its witnesses had any criminal histories. Following the trial, Petitioner discovered that Williams was arrested for theft by deception in 1990. Williams was permitted to enter a diversionary Pre-Trial Intervention Program for twelve months, and the charge was dismissed unconditionally on December 17, 1991.[2] Petitioner indicates that this information would have been valuable for attacking the credibility of Williams at trial and that its absence deprived him of due process.

However, as a closed criminal matter that is unrelated to Petitioner's crime and did not result in a criminal conviction, this information would have been inadmissible at trial. Petitioner argues that the jury may have believed Williams' testimony to lack credibility if it was possible that she could face additional sanctions for her criminal charge if she failed to cooperate with the prosecution. However, Williams could not be subject to any additional charges regardless of

---

    [2] Petitioner claims that the charges remained open at the time of the trial. However, Petitioner bases this claim on information from a private investigator who was admittedly unable to obtain a certified copy of the record and has not explained how the information was obtained. The state has provided this Court with an affidavit regarding the contents of Williams' confidential criminal case history, indicating that the criminal charge was dismissed.

whether her testimony was helpful to the state; by the time that Snow was killed in 1992, the

matter was closed.  Accordingly, the evidence of her previous arrest would have been

inadmissible at trial.[3]  *See State v. Spano*, 69 N.J. 231, 235 (N.J. 1976) (holding that in the

absence of a criminal record, a conditional dismissal of a previous charge may be admissible

when the dismissal of the charges motivated the witness to testify).[4]

      To constitute a deprivation of due process, prosecutorial misconduct must have been so

severe that it "so infected the trial with unfairness as to make the resulting conviction a denial of

due process."  *Donnelly*, 416 U.S. at 643.  Here, the prosecutor's failure to disclose Williams'

past arrest that did not result in a conviction, did not "infect" the trial with unfairness.  Indeed,

the information would have been inadmissible under New Jersey law.  Even if the information

had been permitted to impeach Williams' credibility, Williams could not have personally gained

any benefits from testifying against Petitioner because her case was closed.  Therefore, it is

highly doubtful that the jury would have reached a different conclusion or viewed her as

substantially less credible based on impeachment by a mere arrest that did not result in a

---

[3]  Petitioner comes close to conceding this point in his reply brief, stating that "if the charge was open when Williams testified in February 2004 [sic: 1994?], that fact could have motivated her to testify in support of the State's case."  Since the state has demonstrated that the charge was not open, it therefore could not have motivated Williams to testify favorably to the State.

[4]  Petitioner also points to an incident in which his uncle observed the prosecutor speaking to Williams in the hallway outside the courtroom about her testimony. However, Petitioner's uncle's recollection of seeing this incident does not address precisely when it occurred; the claim is only that it took place "on the day that... Williams was testifying." Without greater specificity, such as whether Williams had already begun her testimony at the time of this conversation, it is impossible for this Court to review this incident. Moreover, the reported part of the conversation includes just two sentences, which were overheard by a person eavesdropping and not privy to the conversation's broader context.

conviction.  *See Buehl v. Vaughn*, 166 F.3d 163, 182 (3d Cir. 1999) ("government's failure to disclose... the witnesses' complete criminal histories... is offset by the significant amount of evidence presented against [defendant].... [Defendant] cannot show that the government's failure to disclose the information undermined confidence in the outcome of the trial.").

      b.      *The Firearms Report*

Petitioner alleges that the prosecutor prepared a firearms report for Lt. Gary Shyner of Northern State Prison, with the goal of having him testify as an expert and for the report to be entered into evidence.  However, the prosecution withdrew Shyner from the witness list and he never testified against Petitioner.  The absence of any such testimony against Petitioner precludes the possibility that this event resulted in any prejudice.  "[I]mproper conduct is not, in itself, sufficient to constitute constitutional error" unless "the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial."  *Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002).  Here, the jury was never even aware that this event occurred.  This alleged act of misconduct took place entirely outside of the courtroom and could not have "so infected" the trial in a way that resulted in a deprivation of due process.  *Donnelly*, 416 U.S. at 643.  Since the actions did not occur in the course of the trial, they could not have had any impact on "the jury's ability to judge the evidence fairly."  *Young*, 470 U.S. at 12.

Petitioner suggests that even if this Court does not find a constitutional violation here, it should consider the actions of the prosecutor "in light of this incident and her illegitimate motives" of pursuing a conviction rather than justice.  An aggregation of arguably unethical but still non-prejudicial incidents cannot substitute for an actual constitutional violation.  *See Fahy*,

516 F.3d at 204 (holding that the cumulative effect of prosecutorial comments is not relevant unless the comments are both improper and prejudicial).

  c. *Elicited Testimony of Donnelle Williams*

  Petitioner points out that Williams denied witnessing the actual shooting when she was interviewed by the police and when she appeared before the grand jury.  The record suggests that the trial was the first time that she actually claimed to have personally witnessed the shooting.  Petitioner argues that the prosecutor "may have" needed to convince Williams that she saw the shooting take place.  In support of this, he points to the prosecutor's re-direct of Williams:

> PROSECUTOR: Now in my interviews with you did I ask you on several occasions whether maybe you did see the actual gun go over?
>
> WILLIAMS: Yes.
>
> PROSECUTOR: What did you tell me?
>
> WILLIAMS: I said no.
>
> PROSECUTOR: But I told you that you might have seen it. Is that correct?
>
> WILLIAMS: Yes.

(Trial Tr. 124:19–125:23, February 10, 1994.)

  All the information available on this allegation comes from the trial itself.  Contrary to Petitioner's claim, the prosecutor's indication that she "told" Williams that she "might have seen it" is not witness tampering and is not inconsistent with diligent pre-trial interviewing of a witness.  Despite the change in Williams' testimony from her initial statement and grand jury appearance, there is no actual indication that she was manipulated or induced to give favorable

trial testimony, as distinguished from a prosecutor "fronting" the fact that Williams's change in testimony will come out on cross-examination.

The inconsistencies in Williams's testimony was known to Petitioner during the trial. The assertions that she made to the police and the grand jury, indicating that she did not see the actual shooting, were known at the time of trial and exploited during cross-examination. The inconsistency was explored and used as a means to undermine the credibility of Williams as a witness. The jury almost certainly weighed this inconsistency in its deliberations. The accusation of any coercion is based solely upon an indication that the witness and the prosecutor discussed the event prior to trial. There is nothing to indicate that any severe prosecutorial misconduct took place here. Petitioner had ample opportunity to explore Williams' inconsistent testimony at trial and the jury was fully aware of it.

   d.   *Prosecutor's Misconduct During Opening Statement*

Petitioner argues that several statements by the prosecutor during opening statements, when taken in conjunction with other instances of prosecutorial misconduct, "infected the trial to the extent that defendant was denied due process." Specifically, Petitioner points to instances in which the prosecutor: (1) stated that Williams' children were "emotionally traumatized" as a result of witnessing the shooting, (2) suggested that she expected that Dovon Williams would not have "too much to add" to what Donnelle Williams and her other son would testify and therefore might not be called as a witness, (3) misstated Williams' job title, (4) told the jury that the victim had two children, (5) implied that Petitioner should be held to a different legal standard due to his job as a corrections officer and (6) mentioned Williams' stolen car. Petitioner moved for a mistrial as a result of these comments, but the trial court denied the motion.

11

This Court does not find that these statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. This is particularly true given the specific facts of this case, in which Petitioner did not deny being present at the time of the shooting or being involved in the altercation that led to Snow's death. Petitioner's primary defense was that the gun fired accidentally.

The statement that Williams' children were "emotionally traumatized" was improper and an objection to the statement was sustained. Petitioner points to two potential problems: (1) a misstatement of the law in which the prosecutor implied that emotional trauma was an element of "endangering the welfare of children" and (2) absence of supporting evidence for any actual emotional trauma. However, since the judge properly charged the jury at the close of trial, the judge's correction also nullifies the factual dispute, which involved information that is irrelevant under the proper legal standard. Additionally, the jury was properly instructed that no factual inferences were to be drawn from opening or closing statements.

Petitioner objects to the prosecutor's statement that she did not expect to call Dovon Williams because "[h]e was six years old at the time" and "[the prosecutor doesn't] expect there's too much to add to what Mw. [sic] Williams and Lamar will say." (Trial Tr. 104:16–20, February 2, 1994.) Petitioner suggests that this was akin to testifying for Dovon Williams even though he would not be called as a witness. However, the totality of the prosecutor's statement does not naturally lend itself to this interpretation. She stated that she doesn't expect the Dovon would have much to add; she did not outrightly state that he would not have much to add as a reason for not calling this witness. Even if the remark had been technically improper, it was not objected to by defense counsel and does not constitute a due process violation. Juries are capable

12

of understanding the difference between factual statements attributed to a witness as distinguished from an explanation as to why certain eyewitnesses might not be called. *See Donnelly,* 416 U.S. at 640 n.7 (explaining that a jury is capable of understanding a prosecutor's statement of personal belief in the defendant's guilt without inferring factual guilt).  Additionally, the judge made clear in his instructions that no factual inferences should be drawn from opening or closing statements.  It is most improbable that this statement, indicating that a young child might corroborate statements of his testifying mother and brother, if called to the stand, played any meaningful impact in jury deliberations.

The remainder of Petitioner's objections are unlikely to have prejudiced the jury:

It is unclear what bearing Williams' job title would have had on the jury's considerations.

While the fact that the victim had two children could engender sympathy, the idea that a victim has a family is not so outlandish or unexpected as to prejudice the jury against the defendant.

The prosecutor did not, as Petitioner suggests, imply that Petitioner was held to a higher legal standard.  Instead, she merely pointed out that, as a corrections officer, he was sworn to uphold the law and failed to fulfill that responsibility when he shot Snow.  Any confusion over the legal standard of guilt was remedied when the jury was properly charged.

Finally, the prosecutor's reference to Williams' stolen car was only done for the purpose of explaining that Snow was at Williams' apartment to help her with errands since she could not drive herself around; the trial judge explicitly permitted the stolen car to be mentioned in this context.  Given that Petitioner was never accused of stealing Williams' car or being in any way

responsible for its disappearance, this statement could not have prejudiced the jury against him. (*See* Trial Tr. 82:3–14, February 1, 1994.)

For the prosecutor's remarks in opening statements to be prejudicial enough to result in a grant of the writ of *habeas corpus*, they must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.  It is not enough for those comments to have been "undesirable or even universally condemned." *Darden*, 477 U.S. at 181.  For a due process violation to exist, the misconduct needs to be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Bagley*, 473 U.S. 667, 676 (1985).  When looking at the entirety of the opening statement and the opening statement as part of the entirety of the trial, the prosecutor's comments "were either not improper, or if they were improper, not prejudicial."  *Fahy*, 516 F.3d at 204.  None of her statements were of "sufficient significance" to have rendered Petitioner's trial unfair.

     e.    *False Statements Regarding Adjournment and Recess*

Petitioner asserts that the prosecutor falsely told the court that her medical examiner was having hip surgery and would need the start of the trial delayed for two months as a result. This Court has absolutely no idea as to why this allegation is relevant to this application. It had no impact on the trial, occurred before a jury was even selected, and seems to serve no purpose but to try to paint the prosecutor in a negative light.

Petitioner also points to an incident in which the judge permitted a two-day recess so that Petitioner's counsel could moderate a New Jersey Association for Criminal Lawyers seminar in Colorado. Despite the judge's decision not to tell the jury that the seminar would be a "ski seminar," the prosecutor informed the jury that Petitioner's counsel would be skiing while

14

attending the conference. The judge then gave further instructions to the jury to explain that some recreational activities would occur at the seminar.

Juries are not so ignorant or immature that they would allow information like this to affect the serious decision facing them in a murder trial. While it is unfortunate that the prosecutor divulged this information, such a statement would not render any reasonable jury unable to fairly evaluate the case. The comments were not so shocking that they would result in any "probable effect... on the jury's ability to judge the evidence fairly" and did not threaten the integrity of the trial. *Young*, 470 U.S. at 12.

Petitioner again here asserts that the prosecutor's activity here is "another indication of the inappropriate and prejudicial behavior of the prosecutor."  However, Petitioner has yet to demonstrate any behavior on the part of the prosecutor that was so prejudicial as to cause a different outcome at trial.

### f. *Prosecutor's Alleged Intimidation and Harassment of Paul Gainer*

Petitioner points to the prosecutor's intimidation and harassment of Paul Gainer, a security guard at the high school where Williams was employed.  Gainer stated that "if he not [sic] been a strong personality and firm about telling the truth that [the prosecutor] would have manipulated him into telling a lie about [Petitioner.]"  Despite the prosecutor's alleged efforts to persuade Gainer to do otherwise, Gainer informed Petitioner's private investigator that he provided truthful testimony.  Therefore, the prosecutor's alleged misconduct had no effect on the testimony presented to the jury.  Like the incident involving the firearms report, this is a case where the prosecutor's actions, if true as alleged, were arguably unethical and worthy of reprimand.  Nevertheless, when the witness himself concedes that there was no successful

manipulation or intimidation, the actions of the prosecutor could not have had any adverse effect on the jury in a way that "raise[s] doubts as to the fairness of the trial." *Marshall*, 307 F.3d at 67.

g.      *Prosecutor's Closing Statements Regarding Petitioner's Forensic Expert*

Petitioner points to the prosecutor's closing statement, in which she suggested that Petitioner's forensic expert would find a way to obtain a result in favor of Petitioner because he was paid $2,000 for his services.  For support, Petitioner points to *State v. Smith*, 167 N.J. 158, 770 A.2d 255 (N.J. 2001), in which the New Jersey Supreme Court granted a new trial to a defendant because the prosecutor used statements involving the financial compensation of an expert witness.  However, in the context of a federal *habeas* case, the question is not whether state law was followed.  Instead, the question is whether the trial court acted in a way that was contrary to "[Supreme Court] precedent on 'a question of law'" or in a way that reached a decision contrary to the [Supreme Court] when confronted with "materially indistinguishable facts." *Williams*, 529 U.S. at 405.  A federal *habeas* court is not responsible for ensuring that state law was properly followed.  "State prisoners are entitled to relief on writ of *habeas corpus* in federal court only upon showing a violation of federal constitutional standards." *Todaro v. Fulcomer*, 944 F.2d 1079, 1082 (3d Cir. 1991) (citing *Milton v. Wainwright*, 407 U.S. 371, 377 (1972)).

Without a probable change in outcome, the closing statement remark does not warrant a grant of the writ of *habeas corpus*.  *See Duckett v. Mullin*, 306 F.3d 982, 989 (10th Cir. 2002) (prosecutor's suggestion that defense expert witness testified a certain way because of payment does not warrant *habeas* relief);  *see also Rojem v. Gibson*, 245 F.3d 1130, 1143 (10th Cir. 2001) (prosecutor's conduct in closing remarks only warrant *habeas* relief if they "plausibly could have

16

tipped the scales in favor of the prosecution.").  In light of all the evidence presented at trial, the prosecutor's accusation that Dr. Roh might have been influenced by his compensation is not so extraordinary that it could have determined the trial's outcome.

       *h.     Totality of the Prosecutor's Conduct*

       Because Petitioner repeatedly suggested a pattern of prejudicial conduct on the part of the prosecutor, this Court will note that many of the allegations made are better-suited for an ethics complaint than a claim of a due process violation.[5]  However, the alleged conduct does not suggest the absence of a fair trial.  Many of the purported attempts at manipulating the process against Petitioner were thwarted before they could have any impact, and were thus deprived of any prejudicial effect.  The errors that actually made it into trial, many of which were cured by the judge's instructions, were not significant enough to deprive Petitioner of the right to a fair trial.  *See Fahy*, 516 F.3d at 204.  "When the evidence is strong, and the curative instructions adequate, the Supreme Court has held the prosecutor's prejudicial conduct does not deprive a defendant of a fair trial."  *Moore v. Morton*, 255 F.3d 95, 113 (3d Cir. 2001).  The Appellate Division found that "either singly or in combination, none of the prosecutor's complained of misconduct was, under the particular circumstances, so egregious as to have denied defendant a fair trial."  This finding is not contrary to any clearly established Supreme Court precedent, nor is it an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

---

      [5]  The Court notes that Petitioner's trial counsel did, in fact, file an ethics complaint against the prosecutor after the case was completed.

### 2.      *Alleged ineffective assistance of counsel in violation of the Sixth Amendment*

This Court next considers Petitioner's claim that this petition should be granted because Petitioner was deprived of his constitutional right to effective assistance of counsel.  Petitioner raised this issue in his motions for Post-Conviction Relief. Petitioner's argument was rejected, with the Court holding that "[c]ounsel's performance was neither deficient nor prejudicial" and that Petitioner did not "sustain[] the proof to substantiate these claims."

Petitioner makes five specific points on this matter, which will be considered individually.

### a.      *Trial Counsel's Reliance on Prosecutor's Misrepresentation about Williams' Criminal Record.*

Petitioner claims that his trial counsel's failure to diligently inquire into Williams' criminal record constitutes a deprivation of effective assistance of counsel.  In order to demonstrate a deprivation of assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  For reasons discussed *supra*, the information about Williams' prior arrest would have been inadmissible at trial, and the failure to pursue that information therefore had no effect on the outcome of the proceeding.

### b.      *Trial Counsel's Failure to Object to the "Karate Testimony"*

During the trial, Petitioner's counsel stipulated to the State's use of Hinton Kinsler as an expert in martial arts.  Additionally, counsel failed to cross-examine the witness on matters relating to his personal knowledge of Petitioner's capabilities as a brown belt.

18

First, the Court notes that even if Petitioner's counsel did not stipulate to the use of Kinsler as an expert witness, there is no indication that he was not qualified. Therefore, the failure to challenge his expertise likely had no impact. Additionally, "*Strickland* and its progeny make clear that counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681–82 (3d Cir. 2006). While more aggressive questioning might have undermined Kinsler's credibility, it is also possible that, if Kinsler was well-prepared, such questioning would have enhanced his credibility. This is particularly true given that Kinsler had personally seen Petitioner "on the floor," albeit not "in a number of years." Trial counsel made a strategic decision to avoid this risk. Under the presumption of sound strategic judgment, *Strickland,* 466 U.S. at 690, this Court finds that trial counsel was not ineffective for failing to challenge or further question this witness.

### c.      *Failure to Investigate Nance's Altercation with an Inmate*

Petitioner contends that it was a failure of counsel to investigate and object to a line of questioning that revealed that, while working as a corrections officer, Petitioner allegedly broke the jaw of a restrained inmate. However, trial counsel did eventually object and a curative instruction was given to the jury. Though trial counsel could have raised the issue sooner, the issue was still raised and addressed by the trial judge. The failure to raise it sooner is not indicative of ineffective assistance of counsel.

### d.      *Fingerprints Never Taken From the Gun*

Petitioner argues that trial counsel should have raised the fact that the police never checked for fingerprints on the gun. However, this would probably not have made a difference in

19

the trial's outcome.  Both sides agree that there was a struggle over the weapon and many hands touched it.  Petitioner argues that if Snow's fingerprints were found on the trigger, their presence could have raised an issue of reasonable doubt as to who fired the weapon.  However, even if this speculative test result turned out to be true, such a finding, in light of the struggle over the gun, would not result in a different outcome, as is required for a finding of ineffective assistance of counsel.  *Strickland*, 466 U.S. at 694.

Further, it is entirely possible that if defense counsel pressed this argument, the prosecution would have pursued fingerprint testing on the weapon that might well have yielded Petitioner's fingerprints on the trigger.  The decision to avoid this issue was a "strategic choice" on the part of trial counsel and not ineffective assistance.  *See Rolan*, 445 F.3d at 681–82.  Thus, at best, fingerprinting could have proved a point about the struggle for the weapon that the prosecution already conceded.  Any benefit to fingerprint testing was heavily outweighed by the risk that the test would return evidence of the defendant's fingerprints on the trigger.

        *e.*      *Trial Counsel Should Have Obtained a Tape of the "911" Call*

Petitioner suggests that if his trial counsel had obtained Williams' "911" call, it would have revealed that she could not have witnessed the shooting because she left the apartment and was calling "911" at the time of the shooting.  Even if the records showed that Williams made the call from a neighbor's apartment, Petitioner's account of events does not specify when Williams placed the call.  Since it is impossible to determine the exact minute of the shooting, a record of a call made immediately after the shooting is indistinguishable from one made during the shooting.  Accordingly, the outcome would not have been changed by a tape of the 911 call.

Therefore, Petitioner's motion is **DENIED**.

20

Therefore, **IT IS** on this 15th day of September 2008, hereby

**ORDERED** that Petitioner's motion is **DENIED**; and it is further

**ORDERED** because Petitioner has not made a substantial showing of the denial of a

constitutional right, as required by Section 102 of the AEDPA, 28 U.S.C. §2253(c), a Certificate

of Appealability should **NOT** issue; and it is further

**ORDERED** that this case is **CLOSED**.


           **/s/ Faith S. Hochberg**

Hon. Faith S. Hochberg, U.S.D.J.